IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JUSTIN MARCUM,

      Plaintiff,

v.                                Case No. 2:12-cv-00655

CAPT. MCCLOUD, OFFICER ROWE,
OFFICER JOHN DOE, WARDEN DAVID BALLARD,
and COMMISSIONER JIM RUBENSTEIN,
all in their individual and official capacities,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

Pending before the court are a Motion for Summary Judgment filed by defendants Jim Rubenstein and David Ballard (ECF No. 64) and a Motion for Summary Judgment filed by defendant James McCloud (ECF No. 66).  This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).

## PLAINTIFF'S ALLEGATIONS AND PROCEDURAL HISTORY

The plaintiff's Complaint concerns an incident that occurred on January 20, 2012, while the plaintiff was incarcerated at the Mount Olive Correctional Complex ("MOCC"), in Mount Olive, West Virginia.  According to a Notice of Change of Address (ECF No. 83), the plaintiff has been transferred to the Tygart Valley Regional Jail.[1]

---

[1] A search of the West Virginia Regional Jail and Correctional Facility Authority website (www.rja.wv.gov) indicates that the plaintiff was booked into the Tygart Valley Regional Jail on January 16, 2014.  It appears that the plaintiff has finished serving his prior sentence for Breaking and Entering, and is

The plaintiff's Complaint alleges that defendant McCloud engaged in the excessive use of force when he pepper sprayed the plaintiff in his segregation cell in violation of his right to be free from cruel and unusual punishment under the Eighth Amendment.[2]  The plaintiff's Complaint further alleges claims of supervisory liability against defendants McCloud, Ballard and Rubenstein.  The plaintiff seeks monetary damages, as well as declaratory and injunctive relief.

Specifically, the plaintiff's Complaint alleges that, on January 20, 2012, he was having a panic attack in his segregation cell and called for assistance, but was ignored for more than one hour.  (ECF No. 3 at 5-6).  The plaintiff eventually pulled his sprinkler to get a response.  (*Id.* at 6).  The plaintiff further alleges that defendant McCloud arrived with other correctional officers and approached the cell of another inmate who had also pulled his sprinkler.  The plaintiff alleges that McCloud asked the other inmate why he pulled his sprinkler, but ultimately shut off that inmate's water without pepper spraying him.  (*Id.* at 7).

Then, McCloud and Correctional Officer Perkins came up to the plaintiff's cell.  The plaintiff alleges that McCloud screamed "Fuck you Marcum," and I'm done with you" and then sprayed three bursts of pepper spray into the plaintiff's cell, without warning, and slammed his food slot ("bean hole") shut.  (*Id.* at 7).  The plaintiff contends that McCloud never gave him any commands or orders, and that he was not in any way

---

presently serving a sentence on a misdemeanor charge of destruction of property related to a prior incident of flooding his cell at the Huttonsville Correctional Center to which he pled guilty.  (*See* Pl.'s Depo., ECF No. 66, Ex. B at 7-8).

[2]   The plaintiff's Complaint also alleges the use of excessive force by Officers Rowe, Perkins (who is not named in the style of the case), and John Doe.  These individuals have either not been properly identified or were not successfully served with process.  Nevertheless, as will be addressed further herein, the plaintiff's allegations against these individuals do not rise to the level of deliberate indifference.

resisting, but McCloud subsequently wrote up the plaintiff for refusing an order.  (*Id.* at 7-8).  The plaintiff further alleges that the violation was ultimately dismissed.  (*Id.*)

The plaintiff further alleges that, despite his repeated apologies and pleas for assistance, defendant McCloud continued to be verbally abusive and proceeded to pepper spray the plaintiff a second time and, again, struck him several times in the face, before walking off, continuing to cuss about the sprinkler.  (*Id.* at 9).  The plaintiff further alleges that, approximately 15 minutes after he had been sprayed, Correctional Officer Rowe, a named defendant who has never been served with process, approached the plaintiff's cell and asked him if he "had learnt [sic; learned] his lesson."  (*Id.* at 10). Officer Rowe then escorted the plaintiff to the multi-purpose room to see a nurse and be decontaminated.  (*Id.*)

The plaintiff further alleges that he was not permitted to take a shower or wash off the pepper spray for almost one hour and that, when asked whether he would let him take a shower, McCloud allegedly stated "Why should I?"  (*Id.* at 10-11).  McCloud also allegedly threatened to place the plaintiff in a restraint chair for eight hours.  (*Id.* at 10). Ultimately, the plaintiff alleges that he was permitted to take a scalding hot shower, but claims that his cell was not decontaminated or cleaned, so he was forced to continue to be exposed to the pepper spray.  (*Id.* at 11-12).

The plaintiff further alleges that he suffered significant pain and discomfort from the pepper spray in his eyes and lungs, and felt like his skin was on fire.  He claims that he has continued to suffer loss of vision in his left eye and hearing in his left ear, which was filled with pepper spray.  He further asserts that he still suffers from ear aches, skin irritations and rashes and has permanent skin discoloration.  He further claims that he

suffers from severe emotional distress and "fears that another attack is imminent." (*Id.* at 12-13).

Count I of the plaintiff's Complaint alleges that defendants McCloud, Rowe, Perkins and John Doe engaged in the use of excessive force when they sprayed him with pepper spray in his enclosed segregation cell. (*Id.* at 13-14). In Count II of his Complaint, the plaintiff alleges that defendants McCloud, Ballard and Rubenstein are liable as supervisors because, on several occasions prior to the January 20, 2012 incident, McCloud, and other officers supervised by McCloud, Ballard and Rubenstein, used or permitted the use of pepper spray in an unjustified manner for a malicious or sadistic purpose, and that these supervisory defendants were aware of years of widespread and pervasive abuse of inmates. (*Id.* at 14-15). The plaintiff further alleges that these supervisory defendants failed to properly investigate, train, supervise and discipline their officers. (*Id.* at 16-17). The plaintiff further alleges that defendants Ballard and Rubenstein, as policymakers, had actual knowledge of clearly documented instances of abuse and use of excessive force by the officers at MOCC, based upon reports, grievances and administrative appeals, and have failed to take any action to correct or eliminate these violations. (*Id.* at 14-17).

On August 2, 2012, the defendants' initial Motion to Dismiss was granted with regard to the plaintiff's claims for monetary damages against them in their official capacities, but the motion was otherwise denied. (ECF No. 23).

On November 16, 2012, the plaintiff was granted leave to file a Cumulative Supplement in support of his Complaint (ECF No. 27), addressing, in greater detail, his claims of supervisory liability against defendants Ballard and Rubenstein. In summary, the Cumulative Supplement alleges that, by providing one line responses and blanket

affirmances of inmate grievances, without investigation, defendants Ballard and Rubenstein have consistently, and with deliberate indifference, ignored numerous prisoners' claims of intentional, malicious and sadistic conduct by James McCloud and other correctional officers and, in effect, have tacitly authorized such behavior, resulting in a pervasive and unreasonable risk of constitutional injury to the inmates involved. (ECF No. 27 at 1-2).

The Cumulative Supplement further avers that these defendants have permitted the on-going violation of WVDOC policies and procedures concerning the videotaping of use of force incidents.  (*Id.* at 3).  The plaintiff further contends that the failure of these defendants to adequately address, train and discipline the officers involved in these pervasive instances of abuse makes them liable for the behavior of their subordinates.

On November 16, 2012, an Order and Notice was entered setting forth deadlines for discovery, dispositive motions and additional briefing related thereto.  (ECF No. 26).

On April 1, 2013, after the close of discovery, defendants Ballard and Rubenstein filed a Motion for Summary Judgment.  (ECF No. 64).  A separate Motion for Summary Judgment was filed by defendant McCloud on that same date.  (ECF No. 66).  Pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), on April 19, 2013, the plaintiff was notified of his right and obligation to respond to these motions.  (ECF No. 69).

The plaintiff filed Responses to both motions on April 24, 2013.  (ECF Nos. 71 and 72).  On May 10, defendants Ballard and Rubenstein filed a Reply memorandum. (ECF No. 73).  Defendant McCloud filed a Reply memorandum on May 15, 2013.  (ECF No. 74).  These motions are ripe for adjudication.

## **STANDARD OF REVIEW**

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

> A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *See Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986); *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## STATEMENT OF RELEVANT FACTS

### *The plaintiff's deposition testimony*

In 2009, the plaintiff pled guilty to a charge of Burglary by Breaking and Entering in the Circuit Court of Wayne County, West Virginia.  He was subsequently sentenced to 1-15 years in prison.  Following his conviction, the plaintiff was incarcerated at several West Virginia Division of Corrections facilities, including the Anthony Correctional

Center, the Huttonsville Correctional Center, and MOCC.  (ECF No. 66, Ex. B at 13).

During his deposition, the plaintiff acknowledged that he has pulled his sprinkler and

flooded his cell "multiple times," and engaged in other misconduct that eventually

resulted in his transfer to MOCC.  (*Id.* at 13, 24-25).  The plaintiff agreed that he has

created a number of disturbances in the correctional facilities where he has been

incarcerated, and that his conduct has caused safety problems at those institutions.  (*Id.*

at 18-19).  He further confirmed that he had been pepper sprayed as a result of some of

these other incidents, but further stated that, on those other occasions, he refused to

cuff up and come out of his cell.  (*Id.* at 20-21).

The plaintiff further testified that he had previously flooded his cell at MOCC by

clogging his toilet, but had not been pepper sprayed as a result of that incident.  (*Id.* at

26-28).  Rather, the plaintiff claims that the correctional officers usually just come and

turn off the water.  (*Id.* at 28).  The plaintiff claims that this incident was the first time

he had pulled his sprinkler at MOCC.  (*Id.* at 29).

The plaintiff testified that, on January 20, 2012, he woke up feeling aggravated

and was not in a very good mood, which continued throughout the day.  After dinner,

the plaintiff allegedly asked defendant McCloud if he could keep his bean hole open to

get some air, and McCloud agreed to let him do so.  (*Id.* at 36).  Sometime later that

evening, the plaintiff testified that he pushed his emergency call button because he was

"getting real frustrated" and wanted to talk to mental health.  (*Id.* at 40).  The plaintiff

further testified that, after a period of time of getting no response from any staff, he

began to kick his door, but still received no response.  (*Id.* at 45-46).  Thus, the plaintiff

claims that, around 9:00 or 9:30 p.m., approximately 2-2 ½ hours after pressing his call

button, he pulled his sprinkler.  (*Id.* at 46-47).  The plaintiff admitted that he did not

8

have a history of panic attacks, and that he could not say that he suffered from any diagnosed medical condition that night.  (*Id.* at 48-49).

The plaintiff testified that, after he pulled his sprinkler[3], McCloud and Officer Perkins arrived at his cell, and McCloud "starts screaming and started spraying me." (*Id.* at 52).  The plaintiff again stated that McCloud was cussing and said he would "teach" the plaintiff for pulling the sprinkler.  (*Id.*)  The plaintiff claims that he was no longer kicking his door and that McCloud gave him no verbal commands before spraying him.  (*Id.* at 52-53).  The plaintiff testified that he was standing right in front of his bean hole, which had been open all night and, thus, the pepper spray got all over him.  (*Id.* at 53-54).

The plaintiff testified that he attempted to grab some newspaper to block the pepper spray, and that McCloud punched through the bean hole with the pepper spray can in his hand and hit the plaintiff in the face.  (*Id.* at 54-55, 58-59).  During his deposition, the plaintiff backed off his contention that he was sprayed multiple times, but contended that the spraying continued for almost one minute.  (*Id.* at 58).

The plaintiff further testified that he asked McCloud why he hit him in the face, and McCloud stated "it was the heat of the moment" and "he didn't mean to."  (*Id.* at 60).  The plaintiff acknowledged that, prior to this incident, he had a pretty good relationship with McCloud, and that McCloud "gave [him] a lot of leeway."  (*Id.* at 60-61).  When asked if he thought McCloud is someone who intentionally harms inmates, the plaintiff testified "I wouldn't say he intentionally does it, but I think he's got an anger problem too."  (*Id.* at 60).  The plaintiff further testified that he could not say

---

[3]  The plaintiff testified that, when he pulled the sprinkler, a fire alarm went off.  (ECF No. 66, Ex. B at 50).  It is unclear from the record how long the alarm continued to sound.

whether McCloud deliberately intended to harm him that day, but McCloud was "pissed off." (*Id.* at 61).  Later in his deposition, the plaintiff summarized the incident as follows:

> Q.  Okay.  So can you just break it down to me exactly what you think was the problem on that evening?
>
> A.  He came to my door after I pulled the sprinkler and didn't say nothing to me, just started cussing and screaming and spraying and punching through the door.  That's my only thing.  He – he didn't even ask me to do nothing.  If he would have asked me to cuff up, I'd never – I respect McCloud.  If he asked me to do something, I do it.  Because if I've asked him to do something for me, he's went and done it, and I don't – I've never seen him act like that before.

(*Id.* at 71).

During his deposition, the plaintiff acknowledged that he has no lingering health problems or injuries specifically related to this incident, except for his emotional state of distrust of correctional officers.  (ECF No. 66, Ex. B at 98-109).  The plaintiff testified:

> Q.  Tell me how you're mentally hurt.  How have you changed as a result of this event?
>
> A.  The way I look at all COs now, used to I could trust them, and now you just don't know what to expect out of none of them after I seen what he done, because I used to like – pretty much you could say – look up to McCloud because he would always help me out with my family stuff, and where my grandmother's sick, he's always done everything I've ever asked him to do, and now it's like I don't know what – like I have no trust in none of the COs, like – it seemed like you don't know what to expect from none of them, like anything could happen at any moment, you can't let your defense down in front of none of them.

(*Id.* at 99).

Concerning the conduct of defendants Ballard and Rubenstein, the plaintiff acknowledged that they were not present at his cell on the date in question and did not use force against the plaintiff themselves.  (*Id.* at 85-86).  The plaintiff further admitted

that he has no personal knowledge of the review and deliberative process of either Ballard or Rubenstein concerning the plaintiff's own grievances, or those of any other inmates, and the same can be said concerning their review of Use of Force Committee reports.   (*Id.* at 90-95).   The plaintiff further admitted that he has no personal knowledge regarding the training, supervision or discipline of any of the correctional officers under the command of Ballard or Rubenstein.  (*Id.* at 118-119).

*Other evidence offered by the plaintiff*

Included with the plaintiff's Complaint is a grievance he filed on January 26, 2012 concerning this incident.   (ECF No. 3, Ex. A).   McCloud responded to the grievance, stating:  "Mr. Marcum, the force used was to restore and maintain good order in the unit, not as punishment.  All use of forces are reviewed by the Use of Force Committee."   (*Id.*)   This response was upheld without additional comment by defendants Ballard and Rubenstein.  (*Id.*)

The plaintiff also produced a page from his medical record detailing his medical care between January 21, 2012 and February 15, 2012.  (ECF No. 3, Ex. B).  The entry for January 21, 2012 states as follows:

> At approximately 2115 I decontaminated the I/M after he was sprayed with OC spray.  I/M was hit in the eye with the can of spray.  I applied an ice pack to his face.  Wrote nursing protocol for pain 200 mg Motrin [an illegible symbol] PO BID PEN x 3 days.  I/M stated he also hurt his knee in the altercation.  Ice pack was also applied to knee.  [Name of nurse not legible].

(*Id.*)  The remainder of the medical record produced does not address any lingering issues from the altercation; rather, it mainly addresses a recurring heartburn problem. (*Id.*)

With his Complaint, the plaintiff also produced four statements, made under penalty of perjury, from other inmates on his unit who witnessed or overheard the January 20, 2012 incident where the plaintiff was pepper sprayed. (ECF No. 3, Exs. 1-4). The written statements from inmates Larry Walton and Dustin Williamson support the plaintiff's contention that McCloud was cursing at the plaintiff and that no loud verbal commands of any sort were given to the plaintiff before McCloud sprayed the pepper spray into the plaintiff's cell. (*Id.*, Exs. 2 and 3). Both statements further support the plaintiff's contention that he was sprayed multiple times. (*Id.*) Walton's statement further confirms the plaintiff's statement that McCloud hit the plaintiff in the face with the pepper spray canister. (*Id.*, Ex. 2). These documents were re-submitted as exhibits in support of the plaintiff's Responses to the defendants' Motions for Summary Judgment. (ECF Nos. 71 and 72). The defendants were granted leave to depose all four of these inmates and noticed the depositions of three of them.[4] (ECF Nos. 46, 47, 48, 54 55). However, if the depositions were taken, the parties have not produced any evidence therefrom to support their positions.

### *Other evidence offered by the defendants*

Outside of citations to the plaintiff's deposition, the defendants rely upon incident reports that were completed by McCloud and the other correctional officers who were involved in this incident (ECF No. 64, Exs. 2-7; ECF No. 66, Exs. C and. D),[5] and affidavits submitted by defendants McCloud (ECF No. 64, Ex. 8; ECF No. 66, Ex. G), Ballard (ECF No. 64, Ex. 11) and Rubenstein. (ECF No. 64, Ex. 12). The defendants

---

[4]  It appears that inmate Larry Walton's deposition was never noticed.

[5]   The undersigned notes that the copies of the incident reports provided to the court by defendants Ballard and Rubenstein (ECF No. 64, Exs. 2-7) have been redacted. However, defendant McCloud has produced unredacted versions of these incident reports (ECF No. 66, Exs. C and D). Accordingly, the undersigned will cite to the exhibits provided by defendant McCloud.

have also produced the WVDOC Policy Directive 325.00 on Discipline of Inmates and the WVDOC Use of Force Model found in Policy Directive 312.02 concerning Less-Lethal Use of Force.  (ECF No. 66, Exs. E and F).

The incident reports indicate that, at approximately 2110 hours (9:10 p.m.) on January 20, 2012, the fire alarm in the plaintiff's unit began to sound.  (Incident reports completed by Capt. James McCloud, Correctional Officer Tim Perkins and Correctional Officer Michael Bowe, ECF No. 66, Exs. C and D).  McCloud, Perkins and Bowe responded to the alarm and discovered water coming out of two cells in Pod 8, No. 807, and the plaintiff's cell, No. 812.  (*Id.*; Affidavit of Capt. James McCloud, ECF No. 66, Ex. G).  The officers observed the plaintiff kicking his cell door.  (*Id.*)  Perkins' report indicates that he and Bowe turned off the sprinklers for those two cells.  (ECF No. 66, Ex. D at 4).

Both McCloud and Perkins contend that McCloud gave the plaintiff several loud commands to stop kicking his door, but the plaintiff refused to comply.  (ECF No. 66, Exs. C, D and G).  Accordingly, McCloud claims that he opened the plaintiff's food slot ("bean hole") and proceeded to deploy two one-second bursts of pepper spray into the plaintiff's cell.  (*Id.*)  When the plaintiff's compliance was gained, he was ordered to strip out and was placed in restraints by Perkins and Bowe and taken to the multipurpose room for decontamination and evaluation by medical staff.  (*Id.*)  An incident report completed by Angelia Robinson, LPN, indicates that she was called to the multipurpose room to decontaminate and assess the plaintiff at approximately 2115 hours (9:15 p.m.).  (ECF No. 66, Ex. D at 3).

In his affidavit, McCloud denies verbally abusing or threatening the plaintiff, and denies using an entire can of pepper spray on the plaintiff, and further denies that he

13

sprayed the plaintiff on two separate occasions.  (ECF No. 66, Ex. G).  He further denies

that he acted maliciously or sadistically in order to cause the plaintiff harm or to punish

him.  (*Id.*)  He maintains that he has acted in good faith to protect the safety of all

inmates located in the Quilliams II unit, and in exercising all of his duties as a Captain at

MOCC.  (*Id.*)

The affidavits of defendants Rubenstein and Ballard assert that they have not

permitted the misuse of excessive force by employees at MOCC, and that there has not

been a pervasive and widespread history of such abuse.  They further deny that they

have failed to properly train, supervise or discipline any employees under their

supervision at MOCC and assert that they have acted in good faith and exercise their

discretion in addressing inmate grievances.  (ECF No. 64, Exs. 11 and 12).

## ANALYSIS

### A.    McCloud's Motion for Summary Judgment.

Defendant McCloud's Motion for Summary Judgment (ECF No. 66) and

Memorandum of Law in support thereof (ECF No. 67) assert that the use of pepper

spray by defendant McCloud on January 20, 2012, was a reasonable amount of force

under the circumstances, and was done in a good faith effort to restore order in the

prison unit.  Accordingly, McCloud asserts that he is entitled to qualified immunity on

the plaintiff's Eighth Amendment claim.

Government officials are not liable for monetary damages if they can show that

their conduct did not violate clearly-established statutory or constitutional rights of

which a reasonable person would have known.  *See Wilson v. Layne*, 526 U.S. 603, 609

(1999).  Qualified immunity exists to protect officers in the performance of their duties

unless they are "plainly incompetent" or they "knowingly violate the law." *Doe v. Broderick*, 225 F.3d 440, 446 (4th Cir. 2000).

In ruling on an issue of qualified immunity, a court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the allegations do not give rise to a constitutional violation, no further inquiry is necessary. *Id.* If, on the other hand, a violation can be shown, then the court must determine whether the right was clearly established in the specific context of the case. *Id.*

However, in *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that courts may decide to address whether the right is clearly established first. The *Pearson* Court noted that the doctrine of qualified immunity "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." 555 U.S. at 230.

As noted in McCloud's Memorandum of Law:

> In *Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987), the United States Supreme Court described the substantial threshold showing necessary to defeat a defense of qualified immunity. The standard turns on the "objective legal reasonableness" of the official's conduct, *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). **In particular, qualified immunity protects law enforcement officers from "bad guesses in gray areas," and it ensures that they may be held personally liable only "for transgressing bright lines."** *Marciarello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) (emphasis added).
>
> A defense of qualified immunity is often asserted by individual officers in cases where excessive force is claimed. In evaluating whether an officer is entitled to qualified immunity on an excessive force claim, the

question is "whether a reasonable officer *could have believed* that the use of force alleged was objectively reasonable in light of the circumstances." *Vathekan v. Prince George's County*, 1998 WL 544765 (4th Cir. 1998); *Rowland v. Perry*, 41 F.3d at 173 (emphasis added).  In such cases, a defendant is entitled to qualified immunity if his or her conduct did not contravene "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Lowery v. Stovall*, 92 F.3d at 222; *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

(ECF No. 67 at 9-10).

Defendant McCloud further emphasizes that "the test for use of excessive force and qualified immunity are separate and distinct.  In essence, qualified immunity is secondary to a defense that an officer did not exert excessive force." (*Id.* at 10, citing *Saucier*, 533 U.S. at 205.  However, even if a court were to find that the force used by an officer was excessive, the officer may still be entitled to qualified immunity if "the law did not put the officer on notice that his conduct would be clearly unlawful." (*Id.* at 10-11, citing *Malley, supra*, 475 U.S. at 341).

Thus, this court must determine whether defendant McCloud's conduct violated any clearly-established constitutional right of the plaintiff.  The plaintiff's Complaint alleges that the defendant's conduct violated his First, Eighth and Fourteenth Amendment rights.

In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take <u>reasonable</u> measures to guarantee the safety of the inmates.'" [Emphasis added]  This is a low standard.  The Supreme Court emphasized that "[p]rison conditions may be 'restrictive and even harsh.'" *Id.* at 833.

In *Hudson v. McMillan*, 503 U.S. 1 (1992), the Supreme Court held that use of excessive physical force against an inmate may constitute cruel and unusual punishment even when the inmate does not suffer serious injury.  The Court held "that whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley [v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  503 U.S. at 6.  The majority opinion noted that "[t]he objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" 503 U.S. at 8. [Citation omitted.]

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.   [Citation omitted.] This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.   Such a result would have been as unacceptable to the drafters of the Eighth Amendment as it is today. * * *

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action. [Citation omitted.]  The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "repugnant to the conscience of mankind." [Citations omitted.]

*Id.* at 9-10.  Near the conclusion of the opinion, Justice O'Connor wrote: "To deny, as the dissent does, the difference between punching a prisoner in the face and serving him unappetizing food is to ignore the 'concepts of dignity, civilized standards, humanity and decency' that animate the Eighth Amendment."  *Id.*, at 11.

The Supreme Court, however, rejected an argument that an objective test of deliberate indifference be established.

We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Thus, to sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the prison official had a "'sufficiently culpable state of mind;'" that is, "'deliberate indifference' to inmate health or safety." *Id.* at 834. (Citations omitted.) The negligent failure to protect inmates from violence will not suffice. *Pressly*, 816 F.2d at 979.

The *Whitley* case, *supra*, involved a riot at the Oregon State Penitentiary where a prison officer was taken hostage. In an attempt to free the hostage, a plan was put in place for an unarmed prison security manager to enter the cell block where the hostage was being held, followed by prison officers armed with shotguns. The security manager ordered one of the armed officers to fire a warning shot and to shoot low at any inmates found climbing the stairs in the direction of the security manager. During this rescue attempt, one of the officers shot an inmate in the left knee. The inmate filed suit in federal court, and at the conclusion of a jury trial, the District Court directed a verdict for the defendants. The Court of Appeals subsequently reversed that ruling and remanded the case to the District Court for a new trial. The Supreme Court granted certiorari, and ultimately found no Eighth Amendment violation.

The *Whitley* Court noted that:

[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and

18

prison staff, in addition to the possible harms to inmates against whom force might be used.

475 U.S. at 320.   The Supreme Court has further emphasized that, "prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Id.* at 321-22 (quoting *Bell v. Wolfish*, 441 U.S. at 547).   Thus, the Court stated that "[u]nless it appears that the evidence viewed in the light most favorable to the plaintiff will support a reliable inference of wantonness in the infliction of pain, under the standard we have described, the case should not go to the jury."  *Id.* at 322.

In *Whitley*, the Court set forth the following five factors that must be weighed in determining whether force was applied in a good faith effort to maintain or restore order, or whether it was done so maliciously and sadistically for the very purpose of causing harm:  (1) the need for application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury; (4) the threat reasonably perceived by the responsible official; and (5) any efforts made to temper the severity of a forceful response.  *Whitley*, 475 U.S. at 321; *Williams v. Benjamin*, 77 F.3d 756, 762 (4th Cir. 1996).  (ECF No. 104 at 13).  The defendants' Memoranda do not specifically discuss the *Whitley* factors.

The defendants' Memoranda emphasize the plaintiff's prior history of WVDOC policy violations and, in particular, his past history of flooding his cells by pulling his sprinkler or clogging his toilet at MOCC and other WVDOC facilities.  (ECF No. 65 at 3-4; ECF No. 67 at 2-3).  The defendants note that, during his deposition in this matter, the plaintiff agreed that he has created a number of disturbances in the correctional

19

facilities where he has been incarcerated, and that his conduct has caused safety problems at those institutions. (ECF No. 65 at 4; ECF No. 67 at 2).

Defendant McCloud's Memorandum asserts that he was permitted to use chemical agents to gain an inmate's compliance and to restore order in the unit, in accordance with Policy Directive 312.02. (ECF No. 67 at 11). McCloud asserts that the plaintiff largely recanted his allegations during his deposition. McCloud's Memorandum states:

> [The plaintiff] testified that he is unsure if Defendant McCloud meant to harm him at all. *Pl.'s Depo.* 61:8-12. Plaintiff demonstrated his resistance to Defendant McCloud by placing newspaper against his food slot. Plaintiff has admitted that at most he was struck one time by Defendant McCloud as he was standing in front of his bean hole and blocking the entryway with newspaper when Defendant McCloud attempted to spray him in his cell to restore order in the Pod. *Pl.'s Depo.* Pgs 82:13-24, 83:1-22. Plaintiff acknowledged that he knew his actions could potentially create a safety issue. *Pl.'s Depo.* Pg. 19:7-10. Plaintiff further admitted that he willingly and knowingly violated DOC's policies on January 20, 2012. *Pl.'s Depo.* pgs. 16:19-22; 18:2-6.

(*Id.* at 11-12). Based upon the plaintiff's concessions, defendant McCloud asserts that the undisputed facts demonstrate that the plaintiff had caused a disturbance and refused to obey commands, and that the deployment of pepper spray was permissible under the DOC Policy Directive and was a reasonable use of force in a good faith effort to restore order. (*Id.* at 12). Accordingly, defendant McCloud asserts that the plaintiff cannot demonstrate that McCloud violated any clearly-established constitutional right, and that McCloud is entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claim.

### *The plaintiff's Response*

On May 6, 2013, the plaintiff filed a response to defendant McCloud's Motion for Summary Judgment. (ECF No. 71). The plaintiff contends that, during his deposition,

he was anxious and "easily manipulated" by the defendant's lawyer, and that "his words were twisted and reiterated, words forced into his mouth and was tricked into recanting and changing most of his story." (*Id.* at 12).

The plaintiff disputes McCloud's contention that he gave the plaintiff several loud verbal commands prior to deploying the pepper spray in the plaintiff's cell, and again offers the written statements from inmates Walton and Williamson who support his contention that no commands or warning were given to the plaintiff. (*Id.* at 4). As previously noted, the deposition of inmate Williamson was noticed, but Walton's was not (ECF Nos. 51 and 55); if the depositions of any of the plaintiff's proposed witnesses were actually taken, the parties have not produced any evidence or testimony therefrom.

The plaintiff further asserts that, at the time that McCloud deployed the pepper spray, the plaintiff was behind a locked cell door, and could not be considered a present threat, as his water had been turned off and he was no longer kicking his door. (*Id.* at 6-7). Accordingly, the plaintiff asserts that <u>no</u> use of force was necessary. (*Id.*) The plaintiff further contends that McCloud "was angry, and felt he needed to teach the disruptive inmate a lesson, punishing him with excessive amounts of pepper spray . . ." (*Id.* at 6). His response further states:

> Defendant McCloud entered the pod, yelling and screaming about he was tired of the plaintiff's disruptions and tired of fucking with him. The defendant walked up the stairs pulled his mace can and stuck it in the plaintiff's already open bean hole this is when the plaintiff was struck in the eye which caused the bruising and swelling complained of. [Footnote omitted.]

> The plaintiff was not flooding at this time. The plaintiff was not kicking his door at this time. The plaintiff's actions could in no way be construed as threatening, therefore there was no use for any amount of force, so being sprayed with pepper spray, being smashed in the face with pepper spray can, in addition to defendant McCloud's threatening comments on the way to the plaintiff's cell before spraying the plaintiff.

(*Id.* at 7).  The plaintiff asserts that this evidence "clearly shows the defendant's frame of mind, and that his actions were malicious and sadistic used to cause pain and suffering." (*Id.*)

The plaintiff further contends that McCloud's decision to allow the plaintiff to keep his bean hole open was a violation of WVDOC policy directives.  (*Id.* at 3, 8). Likewise, the plaintiff asserts that the failure to videotape this incident also violated the policy directives.  (*Id.* at 5, 8, 11).  Thus, the plaintiff contends that "there is no clear cut evidence of what exactly happened during the interaction between the Plaintiff and Defendant."  (*Id.* at 11).

The plaintiff asserts that these facts demonstrate that certain policy directives are "being blatantly disregarded."  (*Id.* at 8).  The plaintiff further contends that McCloud's statements and conduct prior to the deployment of the pepper spray is "a clear look at the frame of mind the defendant was in prior to, during and immediately after the assault on the plaintiff."  (*Id.* at 10).  Based upon these facts, the plaintiff asserts that McCloud's actions were not done in good faith to quell a disturbance and to restore order and, consequently, defendant McCloud is not entitled to qualified immunity.  (*Id.* at 12-16).

### *Defendant McCloud's Reply*

On May 15, 2013, defendant McCloud filed a Reply memorandum, which asserts that the plaintiff's arguments are speculative and conclusory, and insufficient to defeat summary judgment.  (ECF No. 74 at 1-2).  McCloud further contends that the lack of video evidence concerning this incident is immaterial because there are incident reports by Correctional Officers Bowe and Perkins which document the events and corroborate

defendant McCloud's own report, and which greatly differ from the plaintiff's "story" which was largely recanted during his deposition. (*Id.* at 2-3).

McCloud's Reply further reiterates that WVDOC policy permits the use of chemical agents to gain compliance without staff entry into a cell and to incapacitate inmates prior to entry into a cell of an inmate who is demonstrating passive resistance or active aggression, and that the evidence demonstrates that McCloud adhered to this policy. (*Id.* at 3). McCloud asserts that the plaintiff has failed to show any genuine issue of material fact and the undisputed evidence of record demonstrates that the plaintiff's claims are untrue. (*Id.* at 4). Accordingly, McCloud again asserts that he is entitled to qualified immunity and judgment as a matter of law in this matter. (*Id.*)

Although not produced in their entirety with the parties' summary judgment filings, WVDOC Policy Directive 312.02, which governs "Less-Lethal Use of Force" and Policy Directive 313.02 concerning "Calculated Use of Force," which includes the Calculated Use of Force Videotape Guidelines, were produced during discovery and are relevant to the discussion of the plaintiff's Eighth Amendment claim. Policy Directive 312.02 is attached to this Proposed Findings and Recommendation as "Court's Exhibit A." The Videotape Guidelines section of Policy Directive 313.02 was submitted as an exhibit to the plaintiff's Responses to the Motions for Summary Judgment. (ECF No. 71, Ex. 2; ECF No. 72, Ex. 1-2).

Policy Directive 312.02 defines "Force Continuum" as "a model to assist staff in designating appropriate conduct when selecting a level of control for use on a resisting inmate." (Court's Ex. A at 1). The policy directive further defines the following terms:

<u>One Plus One Theory:</u> A conservative force continuum theory which advocates that officers can use one level of control higher than the level of resistance used by the inmate.

> Resistance:   The force used by an inmate against the officer who is
> effecting an arrest or apprehension or otherwise engaged in the lawful
> performance of his/her assigned duties.
>
> Intermediate Control Tactics:   any divisionally approved tool or physical
> technique that may be utilized in gaining control of a non-compliant or
> combative inmate when verbal direction has failed and deadly force is not
> justified.

(*Id.* at 2).  The policy directive also discusses, *inter alia*, various forms of resistance and

the levels of control deemed to be appropriate to address such resistance.  (*Id.* at 4-8).

The policy directive also includes a "Use of Force Model" which suggests

appropriate control tools and techniques for certain generalized behavior.  (*Id.*, Attach.

1).  The Use of Force Model, which was also offered by defendant McCloud as Exhibit F

to his Motion for Summary Judgment, states that "These are general guidelines and

each situation should be assessed for the appropriate intervention strategy.   In all

situations, <u>verbal direction and efforts to temper</u> should be attempted unless doing so

would create a risk to the safety of persons involved."  (*Id.*) [Emphasis added].

Applying the *Whitley* factors to the facts of this case viewed in the light most

favorable to the plaintiff, there is a genuine issue of material fact concerning whether

there was a need for the force used  and whether McCloud made any efforts to temper

the need for the use of force before taking that action.

First, the plaintiff denies that he was still kicking his door or in any way resisting,

and further stated that, if the officers had asked him to "strip out," he would have

complied with their directions.  (ECF No. 66, Ex. B at 52, 71).  Second, the plaintiff and

at least two other inmates have provided sworn testimony or written statements made

under penalty of perjury indicating that no verbal commands or warnings were given to

the plaintiff before McCloud deployed the pepper spray, and that the only verbal

statements made were cursing and threats to "teach [the plaintiff] for pulling the sprinkler." (ECF No. 66, Ex. B at 52-53, 82; ECF No. 71, Ex. 1; ECF No. 72, Ex. 1-2). These statements were also included with the plaintiff's Complaint. (ECF No. 2, Ex. 2, 3).

On the other hand, the incident reports completed by McCloud and Perkins (ECF No. 66, Exs. C and D), and McCloud's affidavit (ECF No. 66, Ex. G), contend that the plaintiff refused commands to "strip out" and continued to kick his door. In light of the plaintiff's alleged refusal to comply with these commands, McCloud and Perkins state that McCloud then deployed two one-second bursts of OC spray. (ECF No. 66, Exs. C, D and G). As McCloud labeled this use of force as spontaneous, rather than a calculated, there is no video evidence to confirm either version of the incident.

Policy Directive 312.02 repeatedly suggests that "verbal direction" is a significant step in attempting to gain control of a non-compliant or combative inmate prior to the use of a soft intermediate control tactic, such as the deployment of OC spray. (Court's Ex. A at 2, 5-6 and Attach. 1, "Use of Force Model"). While not dispositive of whether a constitutional violation has occurred, non-compliance with the applicable policy directive is certainly relevant to whether the level of force used was unnecessary under the circumstances, exhibiting wantonness in the infliction of pain, just as compliance with the applicable policy directive may be equally powerful evidence that the officer acted in good faith and without malice. *See Williams v. Benjamin*, 77 F.3d 756, 765-66 (4th Cir. 1996).

There also appears to be a factual dispute as to whether the water to the plaintiff's cell was shut off before the pepper spray was deployed, or whether there was any exigency for the officers to enter the plaintiff's cell in order to turn off the water. The

plaintiff asserts that, at the moment he was sprayed, he was not flooding or kicking his door and could not be considered a threat.  (ECF No. 66, Ex. B at 52; ECF No. 71 at 7).  McCloud's incident report states that "Perkins proceeded to shut off the water while I began giving Inmate Marcum loud clear verbal commands to strip out."  (ECF No. 66, Ex. C).  Perkins' incident report suggests that he and Officer Bowe "turned off the sprinklers for cells 807 and 812" prior to the plaintiff kicking his door and the pepper spray being deployed.  (ECF No. 66, Ex. D).  Conversely, McCloud's affidavit indicates that he was seeking "access to [the plaintiff's] cell to turn off the flowing water inside of his cell."  (ECF No. 66, Ex. G, ¶¶ 8 and 9).  The plaintiff disputes this, stating that the sprinkler shut-off valve is not inside the cell.  (ECF No. 71 at 8).

These facts are material to the *Whitley* factors of whether there was a need for force in this matter and whether McCloud made any efforts to temper the need for the use of force before taking that action and, thus, whether this use of force was objectively legally reasonable.  Because this court cannot resolve disputed facts, weigh the evidence, or make determinations of credibility, based upon the evidence of record, the undersigned proposes that the presiding District Judge **FIND** that there is a genuine issue of material fact concerning the plaintiff's Eighth Amendment claim that precludes a finding that McCloud is entitled to qualified immunity and judgment as a matter of law.

### B.     Ballard and Rubenstein Motion for Summary Judgment.

Defendants Ballard and Rubenstein filed a separate Motion for Summary Judgment (ECF No. 64) and Memorandum in support thereof (ECF No. 65), in which they address the plaintiff's claims of supervisory liability.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Court held that supervisors may be liable for the actions of their subordinates where the supervisor, by his own conduct, was deliberately indifferent to, or tacitly authorized or approved prior constitutional violations.  Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984).  The *Shaw* Court identified the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

> 1)      The supervisor had actual constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive  and unreasonable risk" of constitutional injury to citizens like the plaintiff;
>
> 2)      The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit  authorization  of  the alleged offensive practices," and
>
> 3)      There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

*Id.* at 799.

Ballard and Rubenstein's Memorandum in support of their motion asserts, *inter alia*:

> [A]t his deposition, Plaintiff admitted that he had no personal knowledge regarding the allegations of misconduct that he pled against either Defendant in his Complaint.  The direct evidence, as shown through the affidavits of Defendant Rubenstein and Defendant Ballard, demonstrate that Plaintiff has failed to state a viable claim against them.  In the alternative, Defendant Rubenstein and Defendant Ballard request that the Court find that they are entitled to qualified immunity.  Defendants further request that the Court grant judgment as a matter of law in relation to Plaintiff's claim for declaratory and injunctive relief, because there is no evidence establishing that he is entitled to the relief requested.

(ECF No. 65 at 1-2).  Defendants Ballard and Rubenstein further assert that discovery in this matter has revealed the following:

> (1) Plaintiff's Complaint was factually inconsistent with his own testimony; (2) Plaintiff's allegations against Defendant Ballard and Defendant Rubenstein were based upon speculation  and not on Plaintiff's first-hand personal knowledge; (3) There was and is no history of misuse of force at MOCC with regard to the deployment of chemical agents; (4) Defendant Rubenstein and Defendant Ballard did not act deliberately indifferent with regard to inmate safety nor did Defendant Rubenstein or Defendant Ballard fail to properly train, supervise, or discipline any employee of MOCC with regard to the deployment of chemical agents; (5) Plaintiff had a history of intentionally violating DOC policies, intentionally causing disturbances, and engaging in intentional conduct that impacted the safety of himself, his fellow inmates, and correctional employees; and (6) On January 20, 2012, Plaintiff intentionally flooded his cell, created a disturbance at MOCC, refused verbal commands by Defendant McCloud, and was exposed to chemical agents to stop his dangerous conduct to ensure his personal safety and the safety of all persons at MOCC.

(*Id.* at 2-3).

Defendants Ballard and Rubenstein assert that the plaintiff's allegations against them are speculative and they have submitted their own affidavits refuting the plaintiff's claims.  These defendants claim that there is no evidence demonstrating that, as supervisory personnel, they have been deliberately indifferent to any widespread abuse of inmates at MOCC through the use of chemical agents.

First, they assert that there is no evidence demonstrating that either Ballard or Rubenstein had any actual or constructive knowledge that any of their subordinates, and McCloud in particular, had engaged in conduct that posed a pervasive or unreasonable risk of constitutional injury to the plaintiff, or that they failed to act to prevent the same. (*Id.* at 14).  They further assert that the plaintiff admitted that he has no personal knowledge concerning the training, supervision or discipline provided by these defendants to their subordinates.  (*Id.*)

28

Defendants Ballard and Rubenstein attest that, at the time of this incident, there had not been any widespread abuse of inmates at MOCC through the use of pepper spray, and assert that, between June 1, 2011 and February 1, 2012, the plaintiff was the only inmate to file a grievance about being pepper sprayed in his segregation cell.[6]  (*Id.* at 15).  These defendants further assert that they have not condoned or authorized the misuse of force on inmates at MOCC, and that their actions in upholding grievance decisions have been a good faith execution of their discretionary duties.  (*Id.*)  Ballard and Rubenstein further assert that the plaintiff has not produced evidence demonstrating that their responses have been so inadequate as to show deliberate indifference or tacit authorization of the alleged offensive practices, and the plaintiff has not shown a causal link between any alleged widespread unconstitutional behavior and his alleged injury.  (*Id.* at 16-17).

Accordingly, defendants Ballard and Rubenstein maintain that they are entitled to qualified immunity and must be granted judgment as a matter of law on the plaintiff's claims against them.   (*Id.* at 17-18).

### *The plaintiff's Response*

On May 6, 2013, the plaintiff filed a Response to Ballard and Rubenstein's Motion for Summary Judgment.  (ECF No. 72).  The plaintiff reiterates his assertion that he was not given any loud verbal commands and that pepper spraying him was an unnecessary use of force in light of his behavior at the time he was sprayed.  (*Id.* at 2, 4-5).  The plaintiff further contends that, although Ballard and Rubenstein were not

---

[6]  This representation by the defendants is inaccurate, as the court is aware of at least one other grievance filed in the applicable time period concerning the deployment of pepper spray by defendant McCloud into a segregation cell at MOCC.  *See Harper v. McCloud,* 2:12-cv-00656, ECF No. 2, Ex. E (A).

present at the time of this incident, they are not excluded from liability.  (*Id.* at 5).  His

Response further states:

> Defendants Rubenstein and Ballard had the constructive knowledge of the pervasive risk laying in Defendant McCloud yet chose to ignore it. Defendant McCloud has a history of using pepper spray in a[n] excessive manner as corporal punishment.  Neither Defendant Ballard nor Rubenstein responded reasonably to the pervasive risk in Defendant McCloud turning a blind eye to his harmful actions.  * * *

> It can be shown from the grievances [FN 1 - Grievances – Exhibits = 2-3] that went thru [sic; through] both Defendant Ballard and Rubenstein signed off on they had been given necessary warning.  Several grievances about the unneeded use of force was indeed a regular behavior for Defendant McCloud, freely using pepper spray as corporal punishment, and Rubenstein and Ballard allowing him to continue on with it.

> These defendants had received the grievances, so showing them [footnote omitted] prove [sic; proof?] in and of itself that both Defendants had the constructive knowledge yet chose to ignore it.

(*Id.* at 7-8).

The plaintiff's Response discusses two lawsuits filed by other inmates at MOCC

alleging excessive use of force which were settled prior to trial.  (*Id.* at 9, 11).  Those

cases, however, did not involve the use of chemical agents and are, thus, dissimilar and

not relevant to the case at bar.

The plaintiff asserts that Ballard and Rubenstein had "absolute constructive

knowledge" of McCloud's excessive use of pepper spray based upon their review and

affirmance of grievances, and that neither Ballard nor Rubenstein should be entitled to

qualified immunity.  (*Id.* at 13).

### *The defendants' Reply*

On May 10, 2013, defendants Ballard and Rubenstein filed a Reply

memorandum.  (ECF No. 73).  The defendants assert that, with his Response, the

plaintiff submitted, for the first time, various hearsay documents from inmates that

were not produced during the course of discovery and they request that these documents be stricken from the record.  (*Id.* at 1-4).  The defendants' Reply states in pertinent part:

> Improperly and contrary to Plaintiff's prior responses to discovery and deposition testimony, he is attempting to create a genuine issue of material fact by filing documents from inmates in his Response to Defendants' dispositive motion, which are hearsay and which were not produced in discovery.  In particular, in Plaintiff's Response, Exhibits 2, 3, 4 [and] 5 must be stricken in their entirety from the Court's consideration. Plaintiff had in excess of a year to produce evidence that he believed supported his claims.  Based upon his own statements, his claims against Defendants were based upon speculation.  He must not be permitted to discover the legal position of Defendants in a dispositive motion and then produce documents that are hearsay in a response to try and refute summary judgment.  As this Court has held, evidence to be considered in a summary judgment motion must not be conclusory or based upon hearsay.  *In Re Food Lion, Inc. v. McClawhon, et al.*, 151 F.3d 1029 (4th Cir. 1998).   Furthermore, as the Court has further held, "the rules governing discovery were designed to prevent a trial by ambush."  *Walker v. West Publishing Corporation*, 2011 WL 3667613 (S.D. W.Va. 2011).  Thus, the Court must strike from its consideration the improper exhibits filed by Plaintiff and review the direct evidence that demonstrates Defendants are entitled to judgment as a matter of law in this case.

(*Id.* at 3-4).

Ballard and Rubenstein's Reply further reiterates that the undisputed evidence establishes that they are entitled to judgment as a matter of law, and that the plaintiff is now trying to claim that he was manipulated into testifying the way that he did at his deposition and recant that testimony given under oath in an attempt to create an issue of fact where there is none.  (*Id.* at 4).

It is undisputed that the plaintiff has no personal knowledge concerning the deliberative process of defendants Ballard and Rubenstein concerning the plaintiff's own use of force incident and the grievances filed related to that incident, or concerning any other use of force incidents reviewed by these defendants.  Moreover, the plaintiff

admitted that he has no personal knowledge concerning the training, supervision or discipline of correctional officers under the command of Ballard and/or Rubenstein.  At most, the plaintiff testified that he has "seen COs doing the same things over and over and over to the inmate and a bunch of us have filed grievances about it, and it still happens."  (ECF No. 66, Ex. B at 86).  The plaintiff further testified that "it seems like [they are] not trying to correct it in no way down there."  (*Id.* at 87).  The plaintiff further testified that Ballard and Rubenstein don't answer grievances; they simply deny them.  (*Id.* at 92).

Even taken in the light most favorable to the plaintiff, these facts are speculative and do not demonstrate actual or constructive knowledge of a pervasive risk of harm by defendants Ballard and Rubenstein sufficient to establish a claim of supervisory liability on the plaintiff's Eighth Amendment claims.  Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact and that defendants Ballard and Rubenstein are entitled to judgment as a matter of law on the plaintiff's claims against them.

### C.      The plaintiff's claims against other correctional officers.

The plaintiff's Complaint also names "Officer Rowe" and "Officer John Doe" as defendants in the style of his Complaint.  In the body of the Complaint, the plaintiff alleges that Officer Rowe and Officer John Doe were Correctional Officers employed at MOCC and acting under color of state law.  (ECF No. 3 at 1, ¶ 2).  The only other mention of any specific conduct by Officer Rowe is in paragraphs 60 and 63, in which the plaintiff alleges that, nearly 15 minutes after he was pepper sprayed, Officer Rowe came up to the plaintiff's cell and asked him if he had "learnt [sic; learned] his lesson" before he escorted the plaintiff to the multipurpose room for decontamination.  (ECF

32

No. 3, at 10, ¶¶ 60, 63). Furthermore, there are no specific allegations against any Officer John Doe. The plaintiff lists these defendants, along with Officer Perkins, who was not listed as a defendant in the style of the case, in Count I of his Complaint, alleging as follows:

> 92. Defendants McCloud, Rowe, Perkins, and John Does, on January 20, 2012, applied or permitted to be applied [sic; force] to Plaintiff that was unnecessary, and for the purpose of maliciously and sadistically causing harm to Plaintiff.

> 93. The conduct of Defendants McCloud, Rowe, Perkins and Officers John Doe was objectively unreasonable, excessive, and an unwarranted violation of Plaintiff's clearly established rights of which a reasonable corrections officer should have known, pursuant to the Eighth and Fourteenth Amendments of the United States Constitution.

> 94. Defendant McCloud, Rowe, Perkins and Officers John Doe ['s] actions were willful, wanton, intentional, malicious and done with callous, reckless and deliberate indifference to plaintiff's safety.

(ECF No. 3 at 13-14, ¶¶ 92-94).

Service of process was attempted on "Officer Rowe," but the summons was returned unexecuted and a notation in the docket sheet states, "MOCC informs that it does not have an Officer Rowe." (ECF No. 10). In light of discovery and the documents produced in support of the parties' summary judgment briefs, the undersigned believes that "Officer Rowe" is actually Officer Michael Bowe, who, according to the evidence before the court, was involved in turning off the plaintiff's sprinkler and in placing the plaintiff in restraints and escorting him to and from the multipurpose room for decontamination. (*See* ECF No. 66, Exs. C and D). Even taking the plaintiff's allegation that "Officer Rowe" asked him if he had "learned his lesson," this statement was allegedly made after the incident, and is not material to whether the use of force was

reasonable.  Thus, the allegations against Rowe (Bowe) are insufficient to establish an Eighth Amendment violation.

Moreover, although Officer Perkins was present at the time the plaintiff was pepper sprayed, he was not the individual who sprayed the plaintiff and it has not been alleged or established that he engaged in any particular conduct other than accompanying McCloud to the plaintiff's cell.  (ECF No. 2 at 7, ¶¶ 40, 41).  Furthermore, no additional officers have been identified by the plaintiff as being Officer John Doe, and there are no specific allegations concerning the conduct of any such officers.

During his deposition, the plaintiff testified that he is "not alleging anything improper" against Officer Rowe, Officer Perkins or any officers other than McCloud.  (ECF No. 66, Ex. B at 85).

Notwithstanding the failure to properly identify and serve process on any additional defendants, the plaintiff's allegations against these additional defendants are vague and conclusory and do not rise to the level of deliberate indifference.  Pro se complaints are held to less stringent standards than those drafted by attorneys, and the court is obliged to construe liberally such complaints.  However, in *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), a civil rights case. The Court wrote:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted). Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556.
>
> * * *
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

129 S. Ct. at 1949-50.

Because the plaintiff's Complaint fails to state a claim upon which relief may be granted under the standards set forth in *Twombly/Iqbal*, defendants Rowe (Bowe), Perkins and John Doe have not been served with process and should not be required to appear or defend this matter.

### D.    The plaintiff's claims for declaratory and injunctive relief.

In addition to his claims for monetary relief, the plaintiff seeks numerous forms of declaratory and injunctive relief in his Complaint. (ECF No. 3). Even if such relief were available, the plaintiff's claims for declaratory or injunctive relief are now moot, due to the plaintiff's transfer from the Mount Olive Correctional Complex.

35

The power of the federal courts to adjudicate claims turns on the existence of a case or controversy.  U.S. Const., art. III, § 2; *Daimler-Chrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  "When a case or controversy ceases to exist because the issue is no longer live or a party 'lack[s] a legally cognizable interest in the outcome[,]' preventing the court from granting effective relief, the claim becomes moot, and the court lacks the constitutional authority to adjudicate the issue."  *Taylor v. Riverside Regional Jail Authority*, 2011 WL 6024499 *4 (E.D. Va., Dec. 2, 2011) (citing *Powell v. McCormack*, 395 U.S. 486, 496 (1969) and *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

As noted in *Taylor*, well-established Fourth Circuit precedent has recognized that "the transfer or release of an inmate from the facility where he suffered the challenged conditions 'moots his claims for injunctive and declaratory relief' pertaining to his imprisonment." 2011 WL 6024499 at *4; *see also Rendellman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("as a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.")  For these reasons, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's requests for declaratory and injunctive are moot, and must be dismissed.

### E.     The plaintiff's claims under First and Fourteenth Amendments.

In his Complaint, the plaintiff also alleged that the defendants' conduct violated his rights under the First and Fourteenth Amendments.  (ECF No. 2 at 2).  His Complaint does not contain any specific allegations or otherwise elaborate on these claims.  The plaintiff has not established any evidence to support a finding that the defendants' conduct violated the plaintiff's First or Fourteenth Amendment rights under

the circumstances.  Accordingly, the defendants are entitled to judgment as a matter of law on these claims as well.

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion for Summary Judgment filed by defendants Ballard and Rubenstein (ECF No. 64) and **DENY** the Motion for Summary Judgment filed by defendant McCloud (ECF No. 66).

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on Judge Goodwin.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy to the plaintiff and to transmit a copy to counsel of record.

February 21, 2014

Dwane L. Tinsley
United States Magistrate Judge